12-120-13-1-0-9-8 My name is Stanley Okoli and I represent the plaintiff's appellants in this case. This case is quite a complicated one, but the facts are not. It's just the procedural posture of the case that's complicated. The evidence will show that on February 13, 2007, several law enforcement agents executed a search warrant on the plaintiff's home. The plaintiffs were injured in the process and they knew immediately that they would be seeking a legal remedy for the injuries that they suffered. They requested for the identities of these individuals that executed the search warrant and the officers refused to give them their badge numbers or their names. They eventually gave them a designation, Team 11, which described the entire group as a whole. Did that Team 11 include the individual state and local defendants as well as the federal agents? No, Your Honor. I just said Team 11 on a piece of paper and that was it. You've discovered who Team 11 is, right? Yes, Your Honor. And that includes all individual defendants? Correct, Your Honor. All right. So your position is one of the people, and this was at the time of the raid as opposed to 10-15 minutes later? When was the statement made that we are Team 11? It was right after they had executed the search warrant and they were completing the paperwork right in front of the plaintiffs. The plaintiffs requested that information of the officers and the officers gave that information to the plaintiffs directly. There are some allegations that the state and local officers were perimeter officers, that they did not participate in the raid. And my question is, what's your basis for saying that the state and local officers were part of the raid as opposed to outside? Yes, Judge Griffin, we just don't believe any of the defendants. They have concocted, if you don't mind my saying so, a theory that essentially exonerates each and every one of them. We took the deposition of Mr. Higgins, who was the leader of Team 11 at the time, and asked him, look, is there a specific designation for the officers when they execute the search warrant such that you have entry team members and you have perimeter team members? And he said, no. The situation was fluid. It depended on the circumstances, and they made those decisions ad hoc. So, okay, I thought it was my understanding that the federal agents were doing all these raids and the state and local people were really just more assistance. You're saying that there's at least a question of fact as to that? Yes, Your Honor, that's their contention, which we do not concede that point, Your Honor. Do you have other break-ins, other raids, where the state and local individual agents actually were part of the raid that you can confirm? We don't have the paperwork that we were provided doesn't give us that much detail. All I know is that the paperwork that says there's a specific DEA report of investigation that lists all the members that executed the search warrant doesn't say anything about who was part of the entry team and who was part of the perimeter team. And even more suspicious is the fact that two of the state officers, Pyrog and Land, I believe, I know it's two of them, and they are two out of three, remember that they were in the house at some point. Well, why were they ever in the house if they were relegated just to the perimeter? Well, I think they take the position that the raid was done by the experienced federal agents, and then maybe afterwards they came in and maybe helped secure the premises or look for the drugs or whatever, but they didn't have the experience of the federal agents to break the door down and rush in there. I mean, I think that's what the theory is in that they could have been in there later, but they weren't in as part of the raid. Well, Your Honor, I took extensive testimony both at the depositions and at trial, and they testified that they need at the very least five police officers to make entry. Those five police officers are sufficient to secure the home and to do any investigation that needs to be done on the spot. So the case for the perimeter team, or the so-called perimeter team, actually coming into the house at any point seems questionable when you already have at least five officers in the house that are capable of securing it. So I consider all the testimony of these officers completely suspicious because they exonerate each other. The federal defendants say, we didn't do it, and they also turn around and say, oh, by the way, we also know that the state police officers didn't do it either because they would always be on the perimeter. You know, I'm curious. I couldn't find in the record, did you ever file a simple interrogatory to the effect of, you know, identify all the police officers who made the initial entry into the Burleys' home? No, we sent, Your Honor, Judge Gilman, we sent an interrogatory that said, do you agree that you violated the plaintiff's rights? Right, that's very vague. Why did you not focus specifically on the simple question, tell us who entered the home? Because at the time, Your Honor, it was still at the beginning of discovery when we sent out the interrogatories, and we didn't really have the information that came out at the depositions as to who actually did what. But you can send interrogatories out after the depositions game. I suppose we could, Your Honor. The depositions are inconclusive. Send out some more interrogatories, requests to admit. Discovery, in this case, Your Honor, was extremely drawn out because there were some motions that came up. They wanted to, you know, investigate, well, not investigate. They wanted to conduct an inspection of the plaintiff's home to see if it would jog the memories of the defendants, and they did that. So we extended discovery several times. We ran out of time, but I thought that the interrogatory that we sent was sufficient to elicit the information that we were asking. If they were simply saying we were not there, they should have just answered, well, we weren't there. That's an affirmative defense that should have come out fairly early in the case. They didn't present it in the interrogatories. They didn't present it in the initial disclosures. I'm not sure it's an affirmative defense that I wasn't there. I think it's probably an element of your claim that you have to prove that they were there and they did it, but be that as may. Did you ever contact the DEA and ask them who was there? Your Honor, it wasn't the DEA. If you look at the appellant's brief, you will find that we exchanged correspondence with the DEA asking them, you know, who conducted the raid. They sent us a letter back, and this is part of the whole spectacle and the stonewalling that the plaintiffs experienced in this case. They sent us a letter back saying, oh, we're experiencing a transition in the office and we'll get back to you. And we exchanged several correspondence with Wayne County as well. Wayne County even denied completely having the records at first. It was only when we filed a Freedom of Information Act lawsuit in state court that they actually came with the documents two years after we started asking for them. Right, but Wayne County identified the DEA as the responsible agency. They provided us documents that conclusively, I would argue, told us who executed the search warrants.  And the document says on February 13, 2007, A, B, C, D, and E executed a search warrant on these people's homes. There was no ambiguity about it. And we amended our complaint. The plaintiffs were really diligent in this case. I mean, they immediately started searching for this information weeks after the search warrants was executed. I'm looking at Joint Exhibit 17. Is that the one that talks about the 2400 Greeley Address? This was done by Daniel Krause, who was the signifying agent. Your Honor, does it say DEA Report of Investigation? It says Report of Investigation, Drug Enforcement Administration. Correct, Your Honor. Correct. And it lists the names, starting with Bigaki. Yes, Your Honor. And go Brown and Reed and Woloski, et cetera, et cetera, Harding. No ambiguity. If there had been any ambiguity, we would have done a bit more investigation to see. But there was no ambiguity. We were convinced we had our guys. It was only when we got to their depositions, when the statute of limitations had run, that they denied for the first time, after three years of seeking these documents that they gave us, that they finally denied that they were the individuals. And you took these depositions of these named people, and they all claimed we weren't there. The federal agents claimed we weren't there, and the state agents said, oh, we were on the outside. We were in the compound. Did they say who was there? No. They don't know. They don't know. They say on that day the team split. And this is really interesting because we actually had a trial. I would call it a sham trial, but we had one. We didn't get to the jury because the judge, the district court, decided to segregate the issue of liability from the issue of damages and wouldn't let us get past the issue of liability unless we showed someone who would conclusively say these defendants were there. Despite the fact that some of them were wearing baseball hats that were pulled down really low on their faces, some were wearing masks, they admitted as much at their depositions, and they refused to divulge their identities when the plaintiffs asked for it. What did the plaintiffs do wrong? They approached a plaintiff's firm that has done police work for 25 years. We started asking for these Freedom of Information Act requests immediately. If you look at the proofs that we submitted, we started asking for it weeks after the incident occurred. They never provided them. They never provided them. Eventually, Wayne County does, and then they invalidate them when we get to their depositions. Okay. What's your best theory against Wayne County in this case? Your Honor, Wayne County coordinated this event. The defendants all testified to that effect. Okay. So, I mean, that's vicarious liability, but that's not enough for Wayne County, is it? Well, it's a bit more than that, Judge Griffin. Well, Jeffrey Gagaki was the individual who obtained the affidavits and the search warrants that they used as a basis for obtaining and executing the search warrants. He was able to do that because he was also a Wayne County employee. But Wayne County doesn't have vicarious liability for 1983, do they? No, it's not vicarious liability. It's a Monell claim. Okay. I'm just saying, what's the essence of the Monell claim against Wayne County? It's that they refused to conduct an investigation, and they actively blocked every attempt that we made to obtain the documents for two years, and then when they finally provided it, they know, Wayne County at least knows, because they were the ones, they took a roll call every morning to figure out who the officers were going to be working. Operation 8 Mile was a three-day event. My understanding, and as it came out at trial and at the depositions, they never knew which officers would show up until roll call in the morning. It was a three-day event. Wayne County orchestrated all of that. Wayne County organized these people into teams. Wayne County had intimate knowledge. They coordinated the event. So when we started asking for these documents, they certainly had ample time when the trail was still fresh. Do you have something that indicates that that's a policy or an ongoing activity by Wayne County? No, Your Honor. But I cite a case in my brief that indicates that a toleration of a custom, and I do understand that this is one incident, but the fact that they stonewalled us and seemed to actively not want any investigation into this would inert to their detriment in this case. I don't see that as a custom, though. I mean, one act, I don't see it as an established policy or custom at all. Sure, Your Honor. But there is case law, and I cited them. I don't have it right here in front of me. I'm sorry. But it's in my brief, Your Honor, and it states that the fact that they actually made such active efforts to prevent us from getting to the truth actually does hold them liable for a violation of the plaintiff's rights in this instance. Would that be more of a conspiracy theory? No, Your Honor. It would be a Monell claim. I don't know if I said that I'd like to reserve five minutes for... You have five minutes rebuttal. Okay. Am I done, or do I have more time? You have one minute. Okay. Your Honor, it's my contention that the harm that has been done to the plaintiffs is fairly irreversible. We got to trial, and we put these defendants on the stand. They already know what we're going to ask them, and we actually got some really lovely testimony from them, and I think the jury was paying rapt attention to the fact that they were denying that all these three or four documents written by different individuals that tie them into this incident, that they were denying all of them. It was a shock to us that the judge would essentially decide that the documents were not sufficient in and of themselves to establish or at least to create a question of fact for the jury to decide. The trial court essentially was very hostile to our case. It gave legal advice to the defendants and said, Oh, file a motion for a judgment as a matter of law, and I will grant it. And they did that, and he granted it. I've never seen the like, and I'll admit that I'm a lawyer of relatively young years, but I've never seen the like. The hostility was palpable. We also have the issue of the costs that were levied against the plaintiffs in this case. A motion for summary judgment under Rule 56 is the same, is judged under the same standards as a motion for judgment as a matter of law under Rule 50. We presented all our proofs to the trial court. I said to the trial court in my response to the defendant's motion for summary judgment, we don't have anyone who's able to identify the defendants precisely because they actively withheld their identities from the plaintiffs. And we said we're relying only on these documents. If the trial court was inclined to say that the documents were not enough, it should have just granted the federal defendant's motion for summary judgment, and I would have just appealed that decision right from there. But what the trial court did was the worst thing it could have done. It decided to deny the federal defendant's motion for summary judgment, ostensibly allowing us to get to trial. Then when we get to the trial, the trial court makes the on-the-spot decision that we weren't going to be allowed to present the issue of liability to the jury unless we had someone who would say these defendants were on the scene. Well, that's the whole crux of our case, is that what's the use for a 42 U.S.C. 1983 claim or a Bivens action if you can have a police officer refuse to reveal his identity, then turn around and say I wasn't there, even though there are documents conclusively identifying them. I would conclude that it sounds a death knell for a 42 U.S.C. 1983 cause of action and a Bivens cause of action if a police officer is allowed to do just that, refuse to give up identity, and then turn around and deny it in spite of evidence to that effect. Thank you. Any further questions at this time? There's no further questions at this time. Have the defendants allocated this time? Yes, we have, Your Honor. How is the allegation? What is the allegation? Subject to some other preference of the court, we've allocated it ten minutes for the federal officer defendants, I believe one minute for Wayne County, two minutes for Officer Pyrog, one minute for Officer Land, and one minute for Officer Hanger. I've reversed the last two defendants' orders. Any rebuttal time or not? I'm sorry, you don't get rebuttals, do you? I'd be happy to say yes. Okay. Let's go ahead. And I skipped past Theresa Benick from the United States Attorney's Office on behalf of the five federal officers. This court should affirm the district court's grant of judgment as a matter of law in favor of the five federal officers. Although opposing counsel has made much of the suggestion that documents place these officers clearly at the scene, that's not the case. There is a clear ambiguity in the report that the plaintiff's counsel is citing to, and that ambiguity... Well, if there's an ambiguity, doesn't that create a dispute of material fact that gets them to the jury? No, there's not, because there's no ambiguity where there's an impossibility. So the report that's at issue is putting five people in two places at once, and that's not physically possible. Well, it's not true, is it? I mean, the times are 530 for the Hall Street house and 535 for the Greeley house, and they're only a block away. So it's not, I mean, to go a block, I assume maybe they could go one block in five minutes after knocking the door down. I mean, is it physically impossible? It is physically impossible. Officer Reed testified at trial that it's physically impossible to conduct a search warrant and then go, you know, one block away and then repeat the process. Isn't that your problem? These are your documents. These are not the plaintiff's documents. If your document says somebody was here and they were at the other location at the same time, then you've created for yourself a dispute of material fact that gets the plaintiff to the jury. So these reports are, in fact, not the five federal officers' defendants. They, of course, here on a personal liability claim. The documents were authored by another DEA agent who's not a defendant in this case. They're a DEA document. But those DEA documents do suggest a physical impossibility, which is putting five people in two places at once. There's more than that, though. There's another document, Joint Exhibit 16, is the original incident report by Gagaki. And he says that on June 13, 2007, in approximately 1,800 hours, they executed this search warrant on Greeley. So that's a half-hour difference between Hull and Greeley. And Officer Gagaki authored two reports for the warrants executed that day, one for Greeley and one for Hull. Officer Gagaki's report for Hull says that the warrants were executed both at the same time at 6 o'clock. So there is a difference in time between the two sets of reports. So we've got a genuine issue of material fact, do we not? I mean, one report by Kraus says the raid on Greeley was at 5.30, and Gagaki says it was at 6 o'clock. How do we know which one's true? The time, the exact time, is not material. What is material? Wait, wait, wait. You tell me the five minutes is material because it makes it impossible that they could have done them both at the same time. The window in time between reports authored by one author. So Agent Kraus has a five-minute gap which is essentially the same executing warrants at the same time. Officer Gagaki has the warrants executed at the exact same time. All five officers testified that these warrants were executed at the same time. There was no one who testified at trial to suggest that these warrants were not executed at exactly or either essentially the same time. Whether or not the warrants were initiated around 5.30 or initiated around 6 o'clock is not material to whether or not these officers were at another location entirely when entry was made. Somebody broke into the house on Greeley, did they not? There's no question that a warrant was executed on that day at Greeley and that officers did make entry into that house. As a general matter, there are two phases in the execution of a warrant. The first is the entry phase and the second is the search phase. The plaintiffs have been consistent throughout the life of litigation that their alleged injuries happened during the entry phase, not during the search phase. There's a specific process that's always repeated for the safety of the officers to ensure preservation of evidence. There's essentially officers line up, approach the door, knock and announce, make entry, conduct a protective sweep to ensure the safety of the occupants as well as themselves to ensure the preservation of evidence, and only after the scene is secured do the officers then commence any search and complete any paperwork. So how long do you say that that takes, the initial break into the house? The initial protective sweep? Certainly that kind of varies by the size of a house and whether or not there's nooks and crannies for people to hide themselves or evidence in. We assume these were not McMansions. That's correct, Your Honor. The trial testimony was that the entirety of a search or the entirety of the execution of a warrant would take about 20 to 45 minutes. That's the initial break-in and protective sweep? Is that what you're talking about, 20 minutes? No, the 20 to 45 minutes is the execution of an entire warrant. Can you answer my question, the initial break-in? How long does that take? There wasn't trial testimony on that. Why is it physically impossible then if there's no testimony? There's no evidence, right? There was evidence from all five officers about what they were doing and where they were. Okay, and you just told me it's physically impossible to do this in five minutes, but there's no evidence how long it takes. There is evidence from Officer Reed that it's physically impossible to do that in five minutes. That's the conclusion without evidence. I mean, that's not a factual assertion. It's a conclusion. His description of what's entailed in the execution of a search warrant  and Officer Woloski walks through the steps. The other thing is you're saying that the time frame of 5 o'clock for the Hall Street house and 5.35 for Greeley is set in stone, it must be accurate, but then you're saying, well, the list of the officers, however, was totally inaccurate. So we accept the times that are put down on the document but not the people. That's inconsistent too, isn't it,  Your Honour, I would certainly think that there are serious questions as to both of the reports in their entirety. There was testimony from multiple officers that those reports were the product of a cutting-and-paste job by the officer in question. That officer never took the stand. The plaintiff didn't call him to testify. It was Kraus you're talking about. Officer Kraus is not a defendant in this case. But he's part of Team 11, isn't he? Yes, he's a part of Team 11, which is a team that came into existence just for the purpose of this three-day operation. So Team 11 is not associated with any specific law enforcement organization. Rather, it's a team for purposes of this Operation 8. My plaintiffs say that they asked who these raiders were and that one of the officers said, we are Team 11. Is there any evidence to dispute that statement was made? There's no trial testimony on that point at all. But as far as my recollection of any deposition testimony, the five federal officers were not in the plaintiff's house at all, with one exception. Jeffrey Gaganke was present in the house during the search portion alone. He didn't testify that he made any such statement. There's certainly no testimony at all that any of these five federal officers refused to provide their identity. Indeed, when they took the stand, they explained what they would have done had they been asked. They were at another location. They were never asked by the plaintiffs because they weren't there to be asked. One of the plaintiffs says, wait, I recognize Gaganke's voice. Yes, and Carolyn Burley says she recognized Gaganke's voice. I'm sorry, Geraldine Burley said she recognized Gaganke's voice. She said that she heard him speak for a few seconds. She never heard his voice again, and she doesn't remember what he said. At most, what that shows is mere presence in the house, which Jeffrey Gaganke himself testified that he was present in that house, but when he was present was during the search portion, and he found two women present peacefully in the house. More to the point, this court has been clear and consistent that mere presence at the scene of a search without a showing of direct responsibility for any alleged constitutional violation does not subject an officer to liability. Let me ask you, if they were not present, why didn't the interrogatory answer say that? The question, as has already been suggested, was a relatively vague question. The response was truthful, which said, we did not violate anyone's constitutional rights. Then the interrogatory officer said, explain all the reasons why. How is that an honest answer, to not say I wasn't present? Your Honor, those interrogatory responses were provided in August of 2010, I believe, and that came before the officers had the chance to conduct an inspection of the plaintiff's house. So those answers were provided without the benefit of any inspection of the house. These officers conduct at least tens if not hundreds of warrants. The ability to differentiate over time becomes difficult until you have an opportunity to review the actual location and see whether or not you were present. And so you're saying that upon seeing the house, then they remembered that they had not been present? Yes, they became more clear about the events. Obviously, discovery is an iterative process in which every party has the opportunity to kind of fully and more completely understand the facts and issues in a case. And as part of that iterative process, there are opportunities to follow up. If any discovery response is found to be lacking... Help me, Counselor. What would the question have been as a follow-up to a deposition testimony that says I wasn't there and I don't know anybody who was there? What sort of follow-up question can you ask that would get you any information about who was there? Well, certainly the plaintiffs did have the opportunity to pose all five of the federal lawsuits. That's not what I'm asking. I'm asking you when you go into a deposition and all that you've been told in written discovery is that I didn't violate plaintiff's rights, you have a public document from an official governmental agency that says that person was present, and then in the deposition they deny being present and they deny knowing who was there. What follow-up question does an attorney ask to facilitate acquisition of the information of who was there? Who was present with you on the drive over? Who was present with you when you convened for roll call in the morning? Who else works with you regularly on raids? Who is a member of group six of the DEA? And they have that information. You've already provided the Team 11. There's a complete list of Team 11 on which the DEA agents are listed, along with Wolofsky, Pyrog, and Hanger, the three state or local officers, and you have two separate reports that indicate their presence. So we have them placed there by official documents. I guess I'm just back to my same question. I don't understand how an official document that places officers as present, it does not create a dispute of material fact, particularly in the situation that I find concerning that everybody present says nobody, none of us were there and we don't know who was there. The Wayne County record is, in fact, not a document of who was present. It's a record of who was assigned to Team 11 as of that day. It's quite clear from the trial testimony that hundreds of officers from multiple law enforcement agencies, federal, state, and local agencies. The DEA record is a record of who was there that day. Team 11, I will agree with you, is a general description of who the team were, but the testimony was that that was what was told was that it was Team 11. So I just don't think I've gotten an answer to my question of why you don't have a dispute of material fact between a public document that lists these officers as present and the officers' denial of being present such that you've created a jury question. And this Court has been clear that mere presence at the scene of a search is not enough to create liability. That's not what we're talking about. We're talking about whether this is a case that goes to the jury to determine credibility because the jury will get to determine whether Officer Krause's report was an accurate representation of who attended made very shortly after that event as an official document and the statements by every one of these officers that nobody that they know was actually present at this event. And the question of whether or not an issue gets to go to the jury at all is whether or not there's a legally sufficient evidentiary basis for a reasonable jury to find. And no reasonable jury could find in favor of the plaintiff where all they have is a suggestion that someone is at a location. Being at a location is not the same as physically abusing or failing to intervene in the physical abuse of a person. So there's no suggestion. I don't want to waste all your time, but if the plaintiff testifies, officers came in in riot gear and I could not see their faces and they told me a team name and I was injured and here's my doctor's report. You have injury, you have event, you have time. And now you have officers who say we're on the list of having been there but it wasn't us. Your position is all they have to do is all agree to say no one of us was present and that deprives the plaintiff of the opportunity to have a determination of their credibility by a jury. I'm certainly not suggesting that any of the officers agreed to commit perjury before the court. These officers all took an oath and testified as to what they were doing and they were clearly at another location. As far as a report that suggests that they were at that location, putting them at that location is simply not enough. But it's enough to get to the jury, isn't it? For them to determine the credibility issues. But it goes beyond mere credibility because there needs to be an evidentiary basis for reaching that conclusion and there's no evidentiary basis to show that any of these officers participated in either direct physical abuse or had any knowledge or should have had knowledge, means an opportunity to stop physical abuse and failed to do so. There's no showing that any of the officers had the physical proximity to do anything wrong, had the knowledge to do so. There's just no showing of that as to any of the five officers. There is evidence that Gernacki is there because his voice is recognized. You say that it happened later, I guess. What's the timeframe that you claim that she recognized his voice? How much after the door was broken down did she recognize Gernacki's voice according to the federal defendant? Her testimony on that point was pretty brief. So all that she testified to is that it was when she was sitting on the floor. So there's no timeframe? So it could have been right after the door was broken down? It's before she's ever in the living room. Basically any protective sweep always ensures that all the occupants of the home are secured before any search happens. Okay, so it's before the protective sweep. So it's early on. And then there's also testimony of the federal agents, the five of them that are called Group 6, which is a little odd, work as a team. Isn't it a reasonable inference if one member of the team is there that the other four members of the team are also there? To speak more broadly to Group 6, Group 6 is actually a designation within the DEA. It's a nationwide designation, so it doesn't indicate a number of people on a team at all. DEA has many, many members of Group 6. It doesn't matter what they call themselves, but is it a reasonable inference if one member of a team, if a group of officers, the federal officers say that they work as a team, it's reasonable to infer that if one of them is there, that the others are there? No, it's not, because Group 6 is much more than these five individual officers. Group 6 comprised, at least at the time, of about 17 or so officers, and all of those officers are trained and able to work together on any given one. Is it a reasonable inference that the officers that are listed in Group 6 that are on the DEA form, as having conducted the form, the raid, were there since one of the members on the list are there? No, it's the same response, Your Honor, that it's always any member of DEA Group 6 who was present and participating in the operation that day could have been assigned to either of the two warrant locations. The fact that they might have worked together doesn't mean they worked together and were at Hull. Was there testimony that the federal agents were the ones that did the initial raid, that broke the doors down, that threw the grenades and all that stuff, that did the heavy lifting? Yes, the testimony is that all five of the federal officers were part of that raid at Hull. And Greeley as well? There's no clear testimony who actually executed the warrant or made entry on the search warrant at Greeley. Okay, was it the modus operandi, the federal officers are working with state and local officers? I thought it was my understanding that the way they coordinated the activities was the federal officers did the raid and the state and local officers generally did the perimeter. Is that wrong? Oh, I misunderstood your question, Your Honor. Yes, at least for purposes of this operation, the general mode was that the state and local officers appeared to be on the perimeter. Okay, how many officers does it take to do the initial raid, to break down the door and to do the initial raid? It's generally not safe to do it with anything less than six to eight officers. All right. And that's what Higgins, that's what the supervisor of DEA testified, correct? He testified in his deposition he didn't take the stand at trial. Okay. You know, in deciding whether a matter goes to the jury, we not only consider direct evidence, we also consider circumstantial evidence and reasonable inferences that can be drawn from the evidence. I mean, isn't it a reasonable inference that the federal officers, if they did not participate in the raid, were there shortly thereafter and were there at the point of sale? Certainly a reasonable inference that Jeffrey Gaghe was there. He so testified. It's not a reasonable inference to assume that any of the federal officers were there during the entry phase because of the steps that are always part of any search warrant. There's always an approach, knock and announce, secure the premises through a protective suite, as well as conduct any search. So it's not reasonable to expect that any of them would be able to complete that entire process and then make it over to another location a block away and then engage in anything. That's assuming the time frames in the report are correct. We don't necessarily have to make that assumption, particularly if the names of the officers are, according to you, incorrect. Right. And certainly there's no question that the plaintiff's injuries were allegedly sustained during the entry portion of the search, and it's uncontested that these search warrants were executed at the same time. I don't think it is. I mean, one report says it was executed at 6 o'clock. The other one says it was executed at 5.30. So, I mean, the reports themselves contradict each other. Any further questions, Judge? All right, thank you. Good morning, Your Honor. Aaron Thomas appearing on behalf of the defendant appellee, Wayne Kelly. And, Judge Griffin, specific to your question of appellant's counsel, Wayne County should not have any liability under Monell in this case, and we would ask that the decision of the trial court be affirmed. Jeff Gagacki, at the time of the incident, as alleged by the plaintiff and as being represented by the Department of Justice, was a DE agent at the time of this incident. There's no issue with respect there, although he was a Wayne County deputy. He was assigned to the DEA, and he was, according to the plaintiff, working under the auspices of the federal government at the time. Except that it was a warrant from Wayne County, correct? It was a warrant. That is correct. It was a Wayne County warrant. But with respect to any type of Monell type of liability attached to Wayne County, there is none. What's Wayne County's role in putting this joint task force together? Wayne County is one of several police agencies. It was an operation called Operation 8 Mile. It was participated in not only by Wayne County at different points. It could be Oakland County. It could be Macomb County. But this was a Wayne County operation? That's correct. But I'm saying the participants within these types of – So this is a Wayne County operation. One of the things they did was they all wore black, they all wore masks, and the masks are to conceal their identity, so nobody knows who these people are, which actually helps the agents because they can't get identified because they're wearing a mask. And then when they're asked to show their badges and say who they are, they refuse to show badges. They refuse to say their names. And the most they get out of them is we're Team 11. Did Wayne County have anything to do with the policy of them wearing masks to conceal their identity? And two, not to identify themselves, not to show their badges, and all this concealment. We had a fraudulent concealment case right before this. This was kind of fraudulent concealment as well. Did Wayne County have nothing to do with it? Judge, there is no such policy. And, in fact, as counsel indicated, there was, before this federal lawsuit, there was a FOIA request with respect to who the identity of or information with respect to a raid at the Greeley residence involving, and I believe it was Geraldine Burley. By letter, by letter before this particular, before this federal case, before this federal complaint was... Wayne County said they had no documents. We had no documents. And, in fact... Then where did the 600 documents that you later provided to them come from? The specific FOIA request asked about a raid, a search warrant raid at this particular Greeley residence, and it identified a person. Wayne County said that we had no such records. They were... Directed to DEA. They were directed to DEA with a particular telephone number. When this particular lawsuit was filed, and because it specifically talked about Geraldine Burley, and I believe the subject of the warrant was not a Geraldine Burley, when discovery opens up... And, again, that's a FOIA officer that actually responds to the FOIA request. Once discovery in this litigated case comes forward, then obviously we have an obligation to find any records, and the request is a lot broader. And so there were records that were produced to the plaintiffs at that particular time. Let me ask you this real quick. There's a Ninth Circuit case called Dubner v. City and County of San Francisco. I don't know. It's a Ninth Circuit 2001 decision, where a similar case where there was a raid, the officers were not identified, and the court held that the burden, once the plaintiff made out a prima facie case of showing that the arrest was invalid, that the burden shifted to the municipal defendants to provide some evidence that the arrest was lawful. So apparently the Ninth Circuit shifted the liability to the municipality in a situation like this. Can you distinguish that case? Well, I can distinguish it just from this particular point, and that is there was no allegation that Wayne County or that any Wayne County officer participated in this particular,  at the time of this incident, this was a DEA raid. And so I guess, Judge Gilman, I had not considered that particular point because there was no type of allegation with respect to any Wayne County officer. Why do you say it's a DEA raid when there's state and local officers involved? Because the officers that were involved in the actual entry were DEA task force agents at the time of the incident. Well, the DEA, the individual defendants' attorneys, they didn't know who they were. It wasn't us. How do you know that they're necessarily federal agents?  Okay, so it is conceded that they're federal agents, but their identities are still unknown. Is that it? Well, Judge, I guess the only thing I would say, with respect to Defendant Gagaki, who is the only named defendant from Wayne County in this particular case, we do know that he was a DEA agent at the time he was deputized. We have the state and local individual defendants here. Correct. And I'm grappling whether they stay in the case or not, and it seems like the claim against them is weak. However, if you say it's well settled here that it had to be some federal agents and there's no way it could be state and local agents, I mean, they ought to get out of the case. And, Judge, I guess the only thing I'm saying is it is the uncontested testimony of all of the DEA agents. Although the DEA agents each deny that they were the ones that were part of the entry team, it's undisputed that it was DEA-6 agents who, by I guess their mode and policy, do the actual entry into the residence. But how do we know that the local people were on the perimeter if nobody was there to tell us that they weren't inside? Because what we have is just a blanket denial. So we've got all the federal agents saying, I wasn't there. So how can they be testifying that the state and local people were on the perimeter if they're denying they were present? Well, Judge, I think you get that testimony from the state and local police officers themselves. So their denial of entry into the Greeley address. Well, not only that, but the testimony of, I believe, Supervisor Higgins, who said that on these particular entries, it is the DEA agents that make the entry and the local police officers are outside for perimeter. And the reason being is that we, DEA-6, train together. That's, I believe, where you can accept that particular testimony. But with respect to Wayne County, again, I don't believe that there's, with respect to their failure to train theory, Wayne County has no obligation to train non-Wayne County officers, and the only Wayne County officer that was named, we came forward with evidence that, hey, look, he is trained, and even if you accept that he was operating under the policies of Wayne County, there's evidence of our training with respect to force, with respect to detention, but by the plaintiff's own statement, he, Jeff Kagaki, was working under the auspices of the DEA and the federal government at the time. So basically you're just saying Wayne County is the location of the raid and... It really is because this task force that was doing the raids and specifically the raid at Greeley was, basically the raid was conducted by all the testimony, was conducted by DEA Team 6, and all of those individuals are deputized task force officers. Okay, your time is up. Any questions? Thank you. Thank you, Mr. Thomas. Good morning, Your Honors. Rachel Badalamenti on behalf of the Warren Police Officer Sergeant Pyrog. He is one of the state officers that the panel has referred to earlier in argument. To give you a little bit of background, these state officers are part of a team called Comet. The County of Macomb Enforcement Team is assigned to help with this multi-jurisdictional drug and prostitution sweep. So what these officers do, and it's undisputed, they all testified the same, is they show up at the Light Guard Armory on the days designated for Operation 8 Mile. There are hundreds of officers that are there. They're told by someone on the DEA task force, you're going to be on this team or that team. My particular client had no idea what Team 11 was, even at the time of his deposition. Never heard of it. He was told, you go with these guys. He had never met these individuals before, with the exception of one former city of Warren police officer who was a DEA agent at the time. He testified that that DEA agent was not together with him at the Greeley home, but he doesn't know the officers who were with him. So the evidence with respect to the state officers is a little different, because you don't have this, wasn't us. What you have is all- Your client is what, a local officer or state officer? He's a city of Warren police officer. He's actually assigned to the County of Macomb Enforcement Team, which is a drug enforcement team, and Comet, that County of Macomb Enforcement Team, assigns a certain number of police officers to help with this. The city of Warren assigns some, Comet assigns some, Roseville assigns some. Everybody goes to help with this sweep, and it's an annual thing, and I believe it still is going on. But in any event, the three Comet individuals who go are all assigned to the same team. Like I said, they've never met the DEA agents who they are assigned with. They go to the scene. They travel in their own vehicle. Sergeant Pyrog actually remembers driving the three state officers. They go to this address, and they are perimeter security. The testimony is unequivocal. In all the raids, they're perimeter security? That's exactly it, Judge Griffin. In every single raid on 8 Mile, for every single year that these state officers have ever participated, they are perimeter security only. And I guess there's some talk. I mean, it takes special coordination for a team to knock the door down and to enter the premises and to secure the occupants. It would be unlikely that people not knowing each other, not working with each other, would do that, I suspect. The testimony, in fact, was that they go in as a stack, that there's someone who actually holds, and I can't think of the name of the device that they hold to actually break down the door. It escapes me at the moment. But they go in as a stack of six or eight, very close together, and that each has a job. So when the guy in the front goes in, he breaks the door, they step aside, the next two go in, and one goes one way, one goes another way. So they know precisely what's going to happen. They know the layout of the house before they enter into it. My state officer and the other common officers don't even know where they're going. They're given the address that morning. They've never seen the search warrant. They have no idea who they're looking for, who drugs were purchased from in that house. They would never be part of that entry team, and that was testified to by Agent Reed, Brown, by Sheriff Land, by the other common defendant, Hanger, and importantly, and this is very important, Supervising DEA Agent Krause testified that while he used to, in his younger years, be part of the entry team and his role in Team 6, he was, for this year, part of the perimeter team only for Operation 8 Mile. And he remembers Sergeant Pyrog and the other two common officers outside being perimeter security only. Not only does he remember that, but he and Sergeant Pyrog specifically testified in an undisputed and unequivocal testimony that they did not enter the home until such time as the occupants of the home were all seated in the living room. Plaintiffs testified without question that the alleged malfeasance happens before they are brought to their feet and put into the living room. So it is undisputed that the state officers enter into the home, perimeter security as a general rule, enters into the home only after occupants are secure. You heard that already today. But with respect to Sergeant Pyrog, the two common officers, Sergeant or Agent Reed, unequivocally testified and the plaintiffs acknowledged that they don't enter until they're in the living room. And this is very important because you have this it's not me issue in front of the court. Isn't that a question of fact? No, not with respect to these state officers because they're not saying it isn't me. They're saying, yes, we were there. Here's the role we played. Here's what we did. Here's what we would ordinarily do. Interestingly enough, exactly what we did is consistent with what we would ordinarily do. In fact, we were never permitted to do anything. I would have loved to be part of the raids on Operation 8 Mile is what Sergeant Pyrog said. There's no evidence to contradict that. The plaintiffs agree and acknowledge. The other important thing is that while there are ski masks and boots and black pants tucked into black boots and ski masks being worn and they're in all black, every single person that the plaintiff says assaulted them is in all black. The state – Did these people even identify themselves as police officers? Sergeant Pyrog, when he was asked, would have identified himself. He does not know if he did identify himself. When they're dressed in black, does it say – what does it say on the uniform? Does it say police? Say DEA? Say FBI? The deposition that I remember reading about it this morning was that some of them said police, some of them said DEA, and it would have been a marking in all caps on the back of the shirt, and that would have been the plaintiff's testimony where they said that. Okay. Plaintiffs identified people in the residence with DEA on the back of their black uniform? Yes. There were black and there was writing, and they couldn't remember what it said, either police or DEA. Oh, plaintiffs couldn't remember. No, but they said that there were some with writing on the back of their black clothing. But my state agent, my comment officer, Sergeant Pyrog, in particular, was wearing a baseball cap and shorts. He was not wearing – and he never raids. He doesn't even have a ski mask. He knows that some individuals do do raids with ski masks, but he would never use it. But he could not identify the DEA agents that did the entry? He wouldn't know them. He didn't know them before he went to the Lake Guard Armory and was put on their team that day, and so he wouldn't know one way or another. They do a lot of raids these days. They did. I want to say it's between eight and ten a day that are typically done on these. I think that was Sergeant Pyrog's testimony. And how many days did this sequence go on? The program is for three days, and it's an annual program. Okay. So that might have something to do with the confusion of who did this particular raid because they did so many of them. Well, and, I mean, you have to acknowledge, too, with all due respect to the plaintiff's argument, is that what every single defendant said is that during this three-day Operation 8 Mile, they don't remember any house where there was any significant event. So there was no house where anybody claimed an injury, where they saw anybody. Well, they had the grenade incident, didn't they? Right. So the DEA agents recall that grenade exploding on the porch instead of in the home. And then they also, I believe they all testified that there was one big bus that they got where a lot of drugs were found, and that was a big deal. But those are the only two things of significance that happened. And the plaintiff testified, didn't the plaintiff, that there was a boom outside her home before entry? She testified that she heard a boom. She did not know where it came from. And then she testified that her door, she heard the door, the crack of the door open, and that's what brought her outside. So it's unclear if the boom was at her house. I mean, the block that we're talking about, it's a rather narrow street, and so she would be able to hear across the way at the Hall residence if a device like that went off on the porch. So how far apart was Hall from the Greeley address? They are both on the corner, and they are a street away from one another. So we say a block, but the lot sizes are, you know, maybe 60 or 70 feet, and so they're the equivalent of maybe six houses away from each other if you take into account the street. And I was only there once, so I'm estimating, of course. You really can't testify. I mean, does the evidence show how far away the two homes were? Actually, the parties, and I heard Mr. Urbanek talk about it, the parties couldn't remember because there were so many raids done during this program, the parties, the defendants couldn't remember, none of them, what house we were talking about because they didn't remember anybody having an injury. But these federal officers suddenly remembered that it was the Hall house, correctly, because they remembered that there was an explosive device thrown. But Judge Schentz, they didn't remember that until we had an order compelling a home inspection. And then all of the attorneys with plaintiffs and their clients went out to the Greeley street and looked at both homes, took pictures. We actually put a person in charge of sketching out. We had an expert come and actually sketch out the layout of the house so we could better understand. And at that point, so this isn't some situation where everybody says, oh, all of a sudden I remembered. No, no, no. We went out there. We met the plaintiffs. Our clients, this weren't just depositions in a vacuum. Our clients saw the plaintiffs and spoke with them, heard their voices. They heard the officers' voices. Everybody was commingling in a relatively small home. And so at that point, then the officers were able to testify and give discovery responses and explain what their role was. And so even Sergeant Pyrog wasn't sure what he did before he went out to that home. So it was that home inspection and not some improper delay tactic that caused these defendants to remember what actually went on. Liz, I have a question for the jury, not a question for your determination. With respect to the federal defendants, I understand the panel's distinction on that. But with respect to the state defendants, they don't match the physical descriptions. And the plaintiffs acknowledged that there were officers that didn't match that physical description and that those officers who weren't wearing those ski masks were not the ones that assaulted them. They also said that only officers that came in the front door were the ones that assaulted them. Interesting. Right, and the state officers came in through the side kitchen door. And when we walked through this home, that's actually what jogged their memory, is that they remembered coming in through that side kitchen door. So with respect to the federal defendants, I understand the panel's position. But with the state defendants, there just is nothing. There was nothing that put them in the group because they are not in the group. They didn't remember their role. They remembered their role. Every other person that testified testified consistent with their recollection. And the plaintiffs acknowledged that there were officers there who fit the description that the state defendants are giving who were not involved in the misconduct. So everything is consistent with what the state defendants have offered. And for that reason, summary disposition was granted. You have to have some scintilla of evidence more than just they came in the home eventually and we don't know who it was. You can't lump them in the pile of we don't know who it was because we know it wasn't them. All right. We've got other state and local defendants. Thank you. And thank you for that. Do you have anything further for this council? We're going to have to move along because we've got another case here too. Good morning, Your Honors. Joe Fralick on behalf of Lieutenant Hanger of the state police, Michigan State Police. My arguments are similar to the ones that Ms. Bellamy just made, but I have to say something so the state will pay for my hotel room. That's fair. Basically it comes down to this. The plaintiffs were consistent on saying the cops would beat us up were the first ones through the door. They were wearing all black. They were wearing masks and they used flashbang distraction devices. And the comet guys, Hanger, Pyrog, and Land were consistent in saying we didn't see anyone get beat up the way that they claim. We didn't beat anyone up that way. We weren't wearing black. We weren't wearing masks, and we didn't use flashbangs. And then you have the testimony of Special Agent Krause, who has no horse in this race. He's not a party. He says, I was there. I remember. We were outside. We were on the corner of Greeley and Winchester, and I remember a tree. And I was standing behind the tree, and the comet guys were there with me. So the only admissible evidence in this case is that the comet guys were outside. There's nothing to rebut it. It's that simple. So if you have any questions, I'm happy to answer. Any questions? That's fairly simple and straightforward. Thank you. All right. Good morning, Judge Griffin, Judge Gilman, Judge French. My name is John Schapke. I'm representing the last and final of the local officers. I could probably sum up my position even more quickly. Christopher Land is a Macomb County Deputy Sheriff. He was assigned to Comet. That is an organization run by the state police that usually operates within Macomb County. On the day in question, Comet was loaned out to the DEA for additional manpower purposes. The evidence before the trial court at the time of the Rule 56 motion that dismissed Land was fairly limited. It came from the plaintiffs themselves. Plaintiffs themselves testified without challenge, without contradiction, that the assaults perpetrated upon them occurred within moments of the initial entry, within a minute, within seconds. Perpetrated by the same man, one actor, dressed all in black, masked with combat boots, sort of a ninja suit, as they called it. The testimony from my client and the rest of the Comet members was equally unchallenged. They were dressed not in black, not combat boots. They were not part of the entry team. In fact, Christopher Land was wearing cargo shorts, a T-shirt, a mesh jersey that said police, and he remained outside during the initial entry phases. When the sort of scene view was conducted during the discovery of the civil matter, he was part of that. From going through the house, he had a very vague memory that he later entered and helped with paperwork. But based on plaintiff's own testimony, that would have been far, far after the assaults took place. There simply was no evidence before the court implicating him in either the assault or failing to intervene. Can you be of help as to whether there was a name on the black outfits of the people that entered? Land was not. He was never asked that, though. Was anybody, I mean, anywhere in the file, asked, okay, they all wore black. Was there any identification on the back that said DEA, police, or whatever? I believe there is some testimony. I believe it came from plaintiffs themselves, the two Burleys, or a son and a cousin who were present, that some of the black suits had some writing on it. It may have said police, but they're fairly unclear about that. The issue as to identifying the black suit entry team, the identities of those, really is not the issue that pertains to Land. The issue to Land is, was he the assaulter? And he was not. He was not in the place at the time. And there's no evidence to the contrary. Anything further? All right, thank you. All right, you've got five minutes rebuttal. Thank you. To address the state defendants, they make out that there is no question of fact as to what they were wearing. I cite the depositions that they gave. They don't remember this event. Two of them testified that they vaguely remember being at the house at some point. How can they testify as to what they were wearing on this particular day when they don't even remember it? Well, they say there were a lot of raids that day, but I assume they were dressed the same way for all the raids that day. It's an assumption that certainly inerts to their benefit. Well, I doubt that they would go back and change between raids, that's all. Well, Your Honor, the operation was a three-day event. Somebody said that there were eight to ten raids every day. Do you know if that's in the record? I know there were several raids. I'm not quite sure what the numbers were. I'm not privy to that information. Okay, but you don't have any evidence that the state and local individual defendants were involved in breaking down the doors of any other houses during that day, do you? No, Your Honor, I do not. And that's because, Your Honor, I think the underlying theme for my case is the doctrine of equitable estoppel. They told the plaintiffs Team 11 executed the search warrant. They didn't make that up. When we searched and when the documents were finally released to us, there was a Team 11 that executed the search warrant. We're taking them at their word. We can't differentiate between them because they made that impossible. It's nothing that the plaintiffs did. They diligently pursued the case and they filed a Freedom of Information Act and got the documents and named it. Your Honor, I guess one of the problems is going to be let's assume that there's some presumption that Team 11, everybody you named on Team 11 was present, but I think the opposing counsel has made the point that you've got to show which ones were the ones that abused or used alleged excessive force against your clients. The fact that they may have come in the house after the entry team had already secured the house and searched it isn't going to be your proof to show which ones harmed your plaintiffs. What proof are you going to have of that? Judge Gilman, I have no proof, and that's because they created the situation. They refused to reveal the identities. How can we establish liability on someone who may not? There's no proof that they were the ones who stepped on your clients. That's why I'm relying on the doctrine of equitable estoppel. They told the plaintiffs, Team 11, they tried to get to us. If you want individual judgments, I gather, against these particular people you've named, how can you do that if you have no proof that they injured your client? Well, Your Honor, forgive me, but is the appropriate remedy that these officers get away with what they did because they refused to identify themselves? Yeah, and that's a problem. It seems unfair to your clients. It would also be unfair to saddle Officer A, B, or C, though, with thousands of dollars of liability if they weren't the ones that abused your clients. We can run a lottery and say, well, we've got ten people on Team 11. Let's pick three at random, and we'll saddle them with liability, but that's not the law, is it? Your Honor, I have struggled with that issue, but the fact of the matter is that 42 U.S.C. 1983 and Bivens wanted to create the cause of action for individuals whose constitutional rights were violated. If a police officer is allowed to say, I'm not going to give you my identity, and then try to figure it out later, or you try, I'll laugh at you, I'll watch you try, then those causes of actions are invalidated. This problem is of their own making, and it's my inclination to hold the entire Team 11 liable because that's what they told the plaintiffs. Do you have any authority that would allow us to do that, any precedent that says we can do that? Well, I cited some cases in my brief talking about the doctrine of equitable estoppel, which essentially says that no man may take advantage of his own wrong, and that is what they're trying to do. If it's their wrong, that's the problem, though. You can't say that everyone on Team 11 was wrong. I simply don't believe them, Your Honor. The fact that these other officers, we actually remember being at the house at some point. I bet somebody's lying through their teeth. We don't know which one, and you don't know which one. And that's what you had a jury of 12 peers for, isn't it? Yes, Your Honor. The case is so problematic because we put these defendants on the stand, and we elicited information from them. Jury was paying rapt attention. If we go for round two, assuming, and forgive me for making the presumption, but assuming that you do overrule the trial court, goes back to trial court, they already know the script. We've already asked them. For example, I asked them, you said on that day that Team 11 split in half, correct? He says, yes. This is Pat Brown. And I said Team 11 on that day comprised 13 members, correct? He says, yes. I said, how many police officers would you feel comfortable executing a search warrant on a house with? He says at least eight, which also corroborates testimony given by the leader of the team. I need at least eight, three on the perimeter and five for the entry. Well, then I say, if you need at least eight, and you're telling me Team 11 split in half, that means five went to one address and eight went to the other address. And according to your testimony, five would be insufficient to execute a search warrant. And so they know our questions, and I think the only remedy is to grant us a sanction of default against them, because they are going to anticipate these questions now, and we will make a favorable impression on the jury like we did the last time around. Counsel, would you agree that it seems unreasonable to assume, to infer, that a local officer or a state officer who all of a sudden joins a team that day and doesn't even know the teammates would participate in the raid when the raid itself requires very detailed coordination between the officers that do the raid, that somebody that just joins would be unreasonable to assume that all of a sudden he participates in the raid. Would it not? I do agree, Judge Griffin. I just don't credit their stories. Their story is all calculated to get everyone off the hook, and I don't believe them. Oh, I know, but I'm looking at these state, you know, Warren City policemen. I just showed up there. I wouldn't knock the door down and be part of this raid. In fact, I don't even know these guys. I mean, that seems pretty reasonable to me, doesn't it? But that's his testimony, Your Honor, and he's self-serving. Okay. We don't have anything else. All right. And the other thing is Judge Gilman brought up this Ninth Circuit case that would really shift the burden of, I'm not sure if it's production or proof, in a case of concealment like this to the defendants, that when they conceal their identities by wearing masks, they wear masks so nobody knows who they are. I mean, that's the purpose of wearing a mask. And then they say, well, you can't sue us because, guess what, you can't find out who we were because we wore a mask and we refused to give your badge number, refused to give our name. Well, Ninth Circuit said, well, the burden shifts in that kind of a case, and the defendants have the burden there. And it seems like a pretty good argument. My question is, have you raised that issue? Have you preserved that issue? Is it before us? I did cite a case out of the, I believe it was the Ninth District, that in that case it was the district court, not the circuit court. No, the principle of a shifting burden of proof, which seems like it might be appropriate here. Have you raised that issue? No, I only raised the issue of the equitable estoppel issue. I didn't find that case. Okay. All right. Anything further? Well, I think I'm off. You have something? I'll let you wrap it up. Well, there's just so much to go into. Okay. I know I got so much. Okay, thank you very much. Thank you. And the case is well argued.